NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2024 CU 0215

KEVIN D. LACOUR

VERSUS

TRACY CATHERINE TOUPS-LACOUR

*CONSOLIDATED WITH*

NO. 2024 CU 0216

TRACY TOUPS LACOUR

VERSUS

KEVIN D. LACOUR

*Judgment Rendered:* OCT 0 3 2024

\* \* \* \* \* \* \* \*

Appealed from the
22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Case Nos. 2022-12427 and 2022-12485, Division K

The Honorable Patrice W. Oppenheim, Judge Presiding

\* \* \* \* \* \* \* \*

| | |
|---|---|
| Steven M. Mauterer<br>Metairie, Louisiana | Counsel for Plaintiff/Appellant<br>Kevin D. LaCour |
| Angela Cox Williams<br>Jesmin Basanti Finley<br>Slidell, Louisiana | Counsel for Defendant/Appellee<br>Tracy Catherine Toups-LaCour |

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**THERIOT, J.**

In this suit for divorce, custody, and other incidental matters, the father appeals the trial court's custody decree. For the reasons set forth herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

Kevin LaCour and Tracy Toups LaCour were married on September 10, 2011 in St. Tammany Parish, Louisiana. Kevin filed a petition for divorce on May 31, 2022, in which he requested "joint and shared legal care, custody, and control" of the parties' three minor children, M.C.L., M.L.L., and M.A.L.,[1] and that he be designated the domiciliary parent. Tracy filed her own petition for divorce on June 3, 2022, in which she sought sole custody of the children. The matters were consolidated by an order dated June 20, 2022.

A hearing officer[2] conference was held, after which the hearing officer issued a report recommending that the parties be awarded joint custody of the children, with Tracy designated as the domiciliary parent. Tracy filed an objection to the hearing officer's recommendation, pointing out that "[t]he Hearing Officer failed to include the agreed[-]upon stipulation in her report that [Tracy's] cousin, Denise, not be around [Kevin] during his custodial periods." Kevin also filed an objection to the hearing officer's recommendation. He objected to the hearing officer's failure to recommend equal shared physical custody of the children to the extent feasible; however, he did not specifically object to the hearing officer's recommendation that Tracy be designated as the domiciliary parent. Although the parties' objections were initially set for hearing on September 19, 2022, they later agreed that a special setting trial date was needed to try this matter. Accordingly, they entered into an Interim Stipulated Judgment pending the special setting trial,

---

[1] In order to protect the identity of the minor children, we refer to the parties' three minor children by their initials throughout this opinion. See Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2; see also *T.A. v. R.S.*, 2023-0430, n. 1 (La.App. 1 Cir. 9/28/23), 2023 WL 6303227, n. 1 (unpublished opinion).

[2] See La. R.S. 46:236.5(C).

2

which provided, among other things, that the parties would have joint custody of the children, with Tracy designated as the domiciliary parent, until the hearing.

Before the trial date, both Tracy and Kevin filed rules for contempt, in which they alleged that the other party was in violation of the terms of the Interim Stipulated Judgment. The rules for contempt were set for hearing on the special setting trial date.

A bench trial was held on May 9, 2023 on the parties' objections to the hearing officer's recommendations, the motions for contempt, and other matters. In addition to documentary evidence and testimony from Tracy and Kevin, the parties presented testimony from family members, a family friend, and M.C.L.'s counselor on issues pertinent to the trial court's custody determination.

Tracy testified that she believes that she should be awarded sole custody of the children. According to Tracy, she has always been the children's primary caregiver, both during and after the marriage, although she acknowledged that Kevin took on some responsibilities involving the children during the last year of their marriage when she began working outside of the home.

Tracy testified that Kevin is verbally abusive to her and all three children and has been physically abusive towards M.C.L. on several occasions. Following one incident in May 2022, in which Kevin pushed M.C.L. and yelled at her to get out of his house, Tracy left with all three girls and moved into her mother's home.

According to Tracy, from the time she took the girls and left the home in May, Kevin refused to provide any financial support until the end of September, when he was ordered to do so, despite the fact that he had inherited "millions of dollars" from a friend. During this time, she and the three children had to share one bedroom at her mother's house because she could not afford to get a place of her own, and she was forced to drive the children around in a car without air conditioning all summer because she could not afford to have it fixed. Tracy

testified that Kevin would not allow her to retrieve any of the children's belongings from the home, including school uniforms and M.A.L.'s glasses, unless she was accompanied by a police officer, and since he refused to provide any support, she had a very hard time providing for the girls and getting everything they needed to go back to school. Once Kevin began paying child support, he started telling the children that they need to ask Tracy to buy anything they need, including underwear and school uniforms for when they are at his house, since he pays Tracy.

Tracy testified that Kevin refuses to take the girls to appointments or extracurricular activities during his custodial periods. She described one incident involving the father-daughter dance at the girls' private school, which was being held during Kevin's custodial period. Tracy sent Kevin the invitation on Our Family Wizard and told him that the eighth grade girls, including M.C.L., were going to be honored at the dance. Tracy then received a call from M.A.L.'s teacher, who told her that M.A.L. had been crying in class because her dad told her that he could not afford to take her to the father-daughter dance because he gives his money to her mom. Tracy told Kevin about the call from M.A.L.'s teacher and that the teacher had offered to have her husband bring M.A.L. to the dance with their daughter, but Kevin responded, "I am very sorry that you and your attorney have done that to our daughters. I cannot afford it." In the end, none of the girls attended the dance.

Tracy also testified at length regarding the issues involving her first cousin, Denise Toups Schulte. Tracy testified that she believes that Kevin had an inappropriate relationship with Denise during their marriage. She attempted to address her concerns about the relationship with both Kevin and Denise, but she explained that "[t]hey deny it or brush it off like it's okay behavior." Tracy testified that in 2020, her friend Patricia "Tricia" Malone informed her that she saw

4

Kevin touching Denise inappropriately while they were all at a bar listening to Denise's husband play music. Tracy texted Denise about the incident, but Denise explained that Kevin was just playing the drums on her legs and she did not think it was a "big deal," but that she pushed his hands away twice because she thought that other people might think something was wrong with it. In another incident that took place in the summer of 2021, M.C.L. told Tracy that she saw Kevin kissing Denise while Tracy was at work and Kevin and the children were swimming at Denise's house. According to Tracy, M.C.L. was upset about what she saw, and in addition to Tracy, M.C.L. told her grandmother, her cousin, her counselor, and her pediatrician about the incident. Tracy texted Denise the next day, telling her that M.C.L. had told her "that her dad couldn't keep his hand off of her Aunt D . . . [and] that he was touching you and grabbing your butt!" She also told Denise that M.C.L. saw Kevin follow her into the bathroom. Denise responded that she had been drinking wine all day without eating, and that makes her "absent minded," but she vaguely recalled him "smacking [her] butt once." Denise went on to say that she has seen Kevin smack lots of women's butts over the years, so she did not "take offense to it," but she thinks that it is "weird" that M.C.L. only gets upset when Kevin touches her, but not other women. Tracy acknowledged that M.C.L. might be overreacting, but told Denise that "for her not to want to be around you... something was wrong... what he does to you and others is not ok and is teaching my girls that this behavior is ok when it's not!" Tracy told Denise that M.C.L. is noticing how Kevin behaves with Denise and is uncomfortable about it and asked Denise to please not allow Kevin to come to her house without her in the future. Tracy testified that Kevin has continuously claimed that M.C.L. is lying about this incident with Denise and that his denial upsets M.C.L. Tracy testified that M.C.L. no longer wants to be around Denise, and she has asked Kevin on numerous occasions not to bring Denise around the

5

girls, but he has continued to bring her around and even placed pictures of Denise around his house, which makes M.C.L. uncomfortable.

Kevin testified that he believes that he and Tracy should have joint custody of the children, with an equal sharing of physical custody on an alternating weekly basis. Kevin denied Tracy's claim that she is the children's primary caregiver. He testified that Tracy's mother took on a lot of the responsibility for child care early in their marriage until Tracy stopped working outside of the home after M.L.L. and M.A.L. were born. However, once the girls were all in school and Tracy started working outside of the home again, Kevin took on a larger role, in which he frequently brought the girls to school, picked them up from childcare, prepared meals, and supervised or helped with their homework. He explained that he could have continued doing these things after the parties separated, but he only has the girls on alternating weekends and Wednesdays pursuant to the Interim Stipulated Judgment. Kevin testified that this custody arrangement does not give him enough time with the girls, because most of the time that he has them on Wednesdays is spent doing homework, eating, bathing, and getting ready for school the next day. As a result, Kevin has refused to allow the children to participate in activities or go to birthday parties during his custodial periods and instructed Tracy not to schedule anything for the girls during his time. When asked about his refusal to bring the girls to the father-daughter dance at their school, Kevin explained that he had questioned M.C.L. directly about whether she "really want[ed] to go to this," and she said that she did not. In addition, he refused to attend school open houses for the girls, telling Tracy that meetings are her responsibility since she is the domiciliary parent. Nevertheless, Kevin testified that if the trial court gives him more custodial time, he can resume the responsibilities he took on during the marriage and would be willing to allow the girls to go places during his custodial periods.

In addition to an equal sharing of physical custody, Kevin asked the trial court not to designate either party as the domiciliary parent. He complained that since Tracy was designated as the domiciliary parent in the Interim Stipulated Judgment, she has been making decisions for the children without consulting him, such as deciding to send M.C.L. to a private high school, and he believes that the girls are "just being used as pawns for how much money can we get out of this guy." Nevertheless, he testified that he and Tracy have been getting better at talking to each other about the children and should be allowed to make decisions together in the future as they did during the marriage "without having anyone telling us how to do it."

Kevin denied that he was verbally or physically abusive towards Tracy or the children. He testified that he did not push M.C.L. or tell her to get out of his house on the night that Tracy and the girls moved out. He explained that he was recovering from a hernia surgery and had instinctively stuck his arm out to stop M.C.L., who was running towards him, from hitting him. He testified that M.C.L. began crying and asking to go to her grandmother's house, as she often did when things did not go her way, and he responded, "Well, just [f---ing] go."

According to Kevin, once Tracy and the girls moved in with her mother, Tracy did not let him see the girls for several months, and at some point, she took away the girls' electronic devices, preventing him from communicating with them unless he called to speak to them on Tracy's phone. However, he testified that at the time of trial, he speaks to M.C.L. almost daily, and she tells him that she wants to spend more time with him and that she thinks that a 50/50 custody arrangement would be "best for everybody."

Regarding the issues involving Denise, Kevin denied that M.C.L. has ever asked him not to have Denise around. Kevin admitted that he agreed at the hearing officer conference that he would not bring Denise around the children; however, he

explained that he does not abide by that agreement because the hearing officer did not include it in her recommendations. Kevin also admitted that he purposely left a portion of a pleading filed by Tracy's attorney in the divorce proceeding out on the kitchen counter so that M.C.L. would see it. He explained that the pleading concerned M.C.L. and contained allegations about Denise, and he wanted M.C.L. to read it so that he could question her about it.

Sharon Nicole "Nicki" Hebert, a Licensed Professional Counselor and Licensed Marriage and Family Therapist, testified that she began seeing M.C.L. weekly for counseling in 2022. Ms. Hebert testified that M.C.L. talked to her about observing "some romantic encounters" between Kevin and Denise that upset her. According to Ms. Hebert, M.C.L. is still very upset about what she saw and "kind of replays it in her head." She testified that M.C.L. has been accused of making the story up and causing a lot of turmoil in the family, and she is under a lot of pressure from extended family members to talk to Denise and to work things out. However, Ms. Hebert testified that M.C.L. views the relationship between Kevin and Denise as contributing to the breakup of her family, and she has expressed that she does not want Denise around.

Ms. Hebert testified that even though M.C.L.'s primary attachment is with her mother, she does also want to see her father. M.C.L. has never talked to Ms. Hebert about how much time she would like to spend with her dad, but Ms. Hebert had some concerns about Kevin's suggestion that the parties alternate custody weekly. Ms. Hebert's concerns included that M.C.L. has reported "some physical aggression" by Kevin towards her, that M.C.L. has access to too much information for her age at Kevin's house, such as court documents, and that M.C.L. does not keep her therapy appointments when she is at her dad's house.

Tracy's cousin Denise testified at the trial about her relationship with the LaCours. Denise testified that she has been involved in all three girls' lives since

they were born, and has always gone to their birthday parties and spent holidays with them, but this ended in December of 2021, when Tracy started excluding her from gatherings. Denise denied the allegations that her relationship with Kevin is inappropriate. She testified that on the day that M.C.L. claims to have seen Kevin kissing her in the pool, she had been drinking all day, which makes her absentminded, but she only recalled Kevin "smacking [her] on the butt." She denied that M.C.L. saw them kissing. In any event, Denise testified that M.C.L. never seemed upset with her that day at the pool, and only became upset later when Kevin would not allow her to sleep over at Denise's house. Denise denied that M.C.L. seems uncomfortable around her or has ever told her that she does not want to see her.

Tracy's mother, Carmela Moore, testified that she helps out with the girls on a regular basis, including picking them up after school or when they are sick, and she has personally witnessed behavior by Kevin towards the girls that she found concerning. In one incident, Mrs. Moore witnessed Kevin going on a tirade and telling M.C.L., "I'm going to beat the living "F" out of you. You're not going to know where it's going to come from or when it's going to happen." Mrs. Moore did not witness the incident that occurred between Kevin and M.C.L. on the night the parties separated, but she testified that the girls were all sobbing and trembling when she arrived to pick them up. Following the parties' separation, the girls talked to her about things Kevin did or said that upset them, like telling M.A.L. that he did not have the money to take her to the father-daughter dance because "Mom gets all my money," or replacing family pictures on his refrigerator with pictures including Denise. Mrs. Moore testified that M.C.L. has expressed to her that she does not want to be around Denise.

Tracy's high school friend Tricia testified about her observations while living with Tracy and Kevin for several months in 2019 and 2020. According to

Ms. Malone, Tracy was the children's primary caretaker and disciplinarian. She recalled that Kevin would raise his voice and get frustrated quite a bit with the girls and would scream and curse at Tracy. During the time that she lived with Tracy and Kevin, Ms. Malone observed several concerning interactions between Kevin and Denise. On one occasion when they were all at a bar together in June of 2020, she saw Kevin running his hand up Denise's thigh and singing to her about not being able to keep his hands to himself. She texted Denise to let her know that she saw what was going on, and Denise responded that she had moved his hand twice, but Kevin acts that way around her when he is drunk. Two days later, Tracy and Kevin had a Father's Day gathering at their home, and Ms. Malone noticed Kevin paying extra attention to Denise. Ms. Malone testified that she became uncomfortable staying in the home after witnessing how Kevin behaved with Denise, and she moved out the next week.

Following the conclusion of the trial, the trial court issued a judgment and written reasons for judgment dated July 7, 2023. Pertinent to the issues raised in this appeal, the trial court granted joint custody to the parties, with Tracy designated as the domiciliary parent, and ordered that "Denise Schulte shall not be around the children while the children are in Kevin LaCour's care."

Kevin and Tracy both filed motions for new trial. After a September 13, 2023 hearing on both motions, the trial court issued a judgment dated September 29, 2023, granting Kevin's motion for new trial in part and denying it in part, and a second judgment on that same date denying Tracy's motion for new trial and assessing the costs of Tracy's motion for new trial to Kevin.[3] The trial court granted Kevin's motion for new trial in order to reverse and vacate a portion of its contempt ruling against Kevin and further to modify and clarify its order for Kevin

---

[3] Tracy's motion for new trial was filed under the original docket number, prior to the consolidation of the matter. As a result, the trial court ordered counsel for Kevin to prepare separate judgments for the two motions for new trial.

to participate in psychoeducational training; in all other respects, the trial court denied Kevin's motion for new trial.

Kevin appealed,[4] designating the following assignments of error:

1. The Trial Court's permanent banishment of the children's cousin, Denise Schulte, is an abuse of discretion supported only by conjecture, which decision further [led] to error in the Court's analysis of domiciliary custody.

2. The Trial Court committed manifest error in granting Tracy LaCour domiciliary custody of all three children based entirely on evidence concerning only [M.C.L.] and contrary to the evidence.

## DISCUSSION

Each child custody case must be viewed in light of its own particular set of facts and circumstances, with the paramount consideration being the best interest of the child. See La. C.C. art. 131; *Leger v. Leger*, 2022-1113, p. 13 (La.App. 1 Cir. 3/13/23), 363 So.3d 519, 528, *writ denied*, 2023-00512 (La. 6/26/23), 363 So.3d 1231. The best interest of the child standard governs all child custody determinations. *Leger*, 2022-1113 at p. 13, 363 So.3d at 519. The trial court is in the best position to ascertain the best interest of the child given the unique circumstances of the particular case; thus, the trial court's custody determination is entitled to great weight and will not be disturbed on appeal unless an abuse of discretion is clearly shown. *Id.*

Louisiana Civil Code article 134(A) provides the following non-exclusive list of factors that the trial court shall consider, along with any other relevant factors, in determining the best interest of the child:

(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

---

[4] Kevin's Motion for Devolutive Appeal requests an appeal from both the July 7, 2023 judgment and the September 29, 2023 judgment on his motion for new trial. Where a motion for new trial is granted in part and denied in part, the granting of the motion for new trial sets aside and vacates the original judgment on the issue on which a new trial has been granted. *T.A. v. R.S.*, 2023-0430 at p. 12, n. 7, 2023WL6303227 at *7, n. 7. Accordingly, the September 29, 2023 judgment's partial grant of Kevin's motion for new trial set aside and vacated only the portions of the July 7, 2023 judgment relating to one issue of contempt and participation in psychoeducational training. The remainder of the July 7, 2023 judgment remains in effect following the issuance of the judgments on the motion for new trial. See *Id.*

11

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

The weight to be given each factor is left to the discretion of the trial court. *Leger*, 2022-1113 at p. 14, 363 So.3d at 529. In making its determination, the trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in Article 134, nor is the trial court required to specifically explain its weighing and balancing of the Article 134 factors. Rather, the trial court should

decide each case on its own facts and circumstances in light of Article 134 and all other relevant factors. *Id.*

Additionally, in most child custody cases, the trial court's determination is based heavily on factual findings. *Yepez v. Yepez*, 2021-0477, p. 8 (La.App. 1 Cir. 12/22/21), 340 So.3d 36, 41-42. It is well-settled that an appellate court cannot set aside the trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. See *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). When presented with two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart v. State through Department of Transportation and Development*, 617 So.2d 880, 883 (La. 1993). Furthermore, it is well-settled that where there is a conflict in testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact are not to be disturbed by a reviewing court. *Leger*, 2022-1113 at p. 15, 363 So.3d at 529. If documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible that a reasonable fact finder would not credit it, the reviewing court may find manifest error or clear wrongness, even in a finding purportedly based upon a credibility determination. But in the absence of such factors, where the finding is based on the trial court's decision to credit the testimony of one party over the other, the finding can virtually never be manifestly erroneous or clearly wrong. *Rosell*, 549 So.2d at 844-45. One court has observed:

> In child custody cases where two parents are fervently competing for custody and domiciliary status of the children, frequently the trial court must determine the best interest of the children solely from the testimony of the parents and their respective relatives or friends. This naturally passionate and self-interested testimony is rarely objective, leaving it to the trial court, who is in the best position to view firsthand the demeanor and tone of the witnesses, to assess the credibility of the witnesses, and decide how much weight to give the testimony in light of the factors in La. C.C. art. 134.

13

*Fuller v. Fuller*, 54,098, pp. 19-29 (La.App. 2 Cir. 7/21/21), 324 So.3d 1103, 1114, *writ denied*, 2021-01223 (La. 9/27/21), 324 So.3d 621.

Kevin's first argument on appeal is that the trial court erred in designating Tracy as the domiciliary parent. The designation of a domiciliary parent in a joint custody decree is provided for in La. R.S. 9:335(B):

> (1) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.
>
> (2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.
>
> (3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.

The trial court prepared lengthy reasons for judgment, in which it discussed its application of the Article 134 factors to its custody determinations. Although the trial court found many of the factors to be neutral, the trial court expressed doubt or concern about: Kevin's willingness to provide the children with food, clothing, medical care, and other material needs, considering his initial unwillingness to assist financially with the children's needs and his evasive testimony about his financial status; his ability to manage conflict; his refusal to allow the children to participate in the activities they enjoy, merely because the activities occur during his custodial periods; the strained relationship between Kevin and M.C.L. resulting from Kevin's response to M.C.L.'s reluctance to be around Denise and his continued denial or minimization of M.C.L.'s feelings about the issue; M.C.L.'s expressed preference not to see Kevin on any set custody schedule; and Kevin's continual involvement of the children in the litigation.

Based upon the totality of the evidence presented and the demeanor and credibility of the witnesses, the trial court concluded that it is in the best interest of the children to award joint custody to Tracy and Kevin, with Tracy designated as the domiciliary parent.

Kevin argues that the trial court erred in making a decision on the designation of a domiciliary parent for all three girls based on evidence concerning only M.C.L.; however, this assertion is not supported by the record. Many of the concerns or doubts the trial court expressed about Kevin in its analysis of the Article 134 factors involved all three children, not just M.C.L. Furthermore, the weight to be given each factor is left to the discretion of the trial court. *Leger*, 2022-1113 at p. 14, 363 So.3d at 529. While we may have weighed the evidence differently, the trial court is in the best position to ascertain the best interest of the children given the unique circumstances of the particular case. Based upon our thorough review of the record and the unique circumstances of this case, it was not an abuse of discretion for the trial court to conclude that it is in the children's best interest for Tracy to be designated the domiciliary parent.

Kevin's remaining assignment of error on appeal concerns the trial court's inclusion in the judgment of an order "that Denise Schulte shall not be around the children while the children are in Kevin LaCour's care." Kevin argues that the trial court's "permanent banishment" of Denise, "based upon what the mother 'suspected' and what the minor child believed she saw," is devastating to Denise, who has been a part of the children's lives since they were born, and is overly broad and a clear abuse of discretion.

As previously stated, the best interest of the child standard governs all child custody determinations, and since the trial court is in the best position to ascertain the best interest of the child given the unique circumstances of the particular case, the trial court's custody determination is entitled to great weight and will not be

disturbed on appeal unless an abuse of discretion is clearly shown. *Leger*, 2022-1113 at p. 13, 363 So.3d at 519. In assessing the children's best interest in this matter, the trial court expressed concern about the strained relationship between Kevin and M.C.L. resulting from Kevin's reaction to M.C.L.'s reluctance to be around Denise and his continued denial or minimization of M.C.L.'s feelings about the issue, which the trial court concluded "will only serve to further harm the emotional ties between [Kevin] and [M.C.L.]." Based on the evidence presented and in light of the deference owed to the trial court's determinations regarding the best interest of the children, it was not an abuse of discretion for the trial court to place this restriction on Kevin's custodial periods.

## DECREE

For the reasons set forth herein, the July 7, 2023 trial court judgment is affirmed. Costs of this appeal are assessed to appellant Kevin LaCour.

**AFFIRMED.**